## THE BAY QUEEN.

### NEW JERSEY STEAM TRANSP. CO. *v.* THE BAY QUEEN, etc.

*(District Court, S. D. New York.    April 12, 1886.)*

1. COLLISION—OVERTAKING VESSEL—RIVAL BOATS.
    An overtaking steamer must keep out of the way of the one ahead. It is no defense that the latter had not acquired full speed.
2. SAME—ROUNDING POINTS—SIGNAL WHISTLES, MEANING OF—CROWDING—STATE STATUTES.
    When two steamers, bound around a point, and approaching it from the same side, upon courses somewhat crossing, signal to each other, the one giving two whistles, and the other replying with one whistle, such signals mean that the former will starboard her wheel and keep to the left, and that the latter will port her wheel and keep to the right, so far as is reasonably necessary to pass the common point. The outside vessel, in such a case, is bound to keep away enough not to crowd the other; 20 yards being required by the state law.
3. SAME—CASE STATED—RECKLESS NAVIGATION.
    The rival passenger boats B. Q. and D. R. M. left their docks in the Kills, Staten island, at about the same time; both being bound around Long Dock, and between that and a schooner which lay at anchor 400 or 500 feet to the westward and outside of it. The D. R. M. signaled by two blasts of the

whistle; the B. Q. replied by one; the former being then under full speed, but considerably further from the Long Dock than the B. Q., which was under half speed. There was sufficient room for both to pass at the same time between the schooner and Long Dock. When nearly abreast of it, the B. Q.'s stem struck the wheel-house of the D. R. M., doing the latter some damage, but the latter kept on without pause. *Held*, discrediting much of the testimony of the D. R. M., that she was, at the time of the signals, considerably astern of the B. Q.; that she was an "overtaking" boat; and that, as such, as well as by reason of having the B. Q. on her own starboard hand, she was bound to keep out of the way of the latter; that by her signal of two whistles, also, she was bound to keep to the left; that she did not do so to the extent easily within her power, but crowded upon the B. Q.'s course; that she was navigated recklessly, if not with the intention, even, of running down the B. Q., or forcing her upon the dock. *Held, further*, that upon the signals given, the B. Q. could not have anticipated such navigation on the part of the D. R. M.; and having proceeded slowly, and gone as near the Long Dock as was safe, and reversed shortly before the collision, she was without fault, and the damage should be borne by the D. R. M. alone.

In Admiralty.

*Wilcox, Adams & Macklin*, for libelant.

*Stewart & Boardman* and *Geo. L. Nichols*, for claimants.

BROWN, J. At about a quarter past 2 in the afternoon of August 13, 1885, the rival passenger boats the Bay Queen and the D. R. Martin, running from Staten island to New York, came into collision in the Kills, at Port Richmond, very near the end of Starin's Long Dock; the port bow of the Bay Queen striking the Martin just forward of her wheel-house. Both boats were upon their regular trips. The time of each for leaving her dock at Port Richmond was 2:10, and the boats left nearly upon time. The Kills run there very nearly east and west. The Long Dock extends about 400 feet from the shore. The Bay Queen's dock was only a short dock, distant from 400 to 600 feet to the westward of the Long Dock; the Martin's dock was about 1,000 feet further westward. Both boats were accustomed to pass near the end of the Long Dock. At this time there was a schooner lying at anchor from 400 to 500 feet to the westward of the end of the Long Dock, and a little further out in the stream. The tide was about half ebb, running to the eastward. The schooner lay somewhat quartering, and tailing to the south-east. The ordinary course for both steamers was to pass between the schooner and the Long Dock; and the witnesses on both sides prove that there was plenty of room for both to pass between the schooner and the dock, at the same time. The full speed of the two boats was about the same; but the Martin could be more quickly handled. At the time of the collision she was going under full speed, from 10 to 12 knots. The Bay Queen had stopped her engine before the collision, and had at no time reached full speed. The distance from the Bay Queen's dock to the end of Long Dock was not over six or seven hundred feet, less than half the distance from the Martin's dock to the end of Long Dock. The Martin, in shaping her course to pass Long Dock, went about 250 feet outside of the end of the Bay Queen's dock. The

Bay Queen's dock was so near to Long Dock that the Bay Queen was obliged to start out under a hard a-starboard wheel, and keep her wheel to starboard until she got far enough out to be able to clear the Long Dock; and then, when near the end of the dock, she would straighten down to the eastward. Until she approached the end of the Long Dock she was subject to the eddy, which was somewhat against her on the ebb, while the Martin, from opposite the Bay Queen's dock, had little or none of the eddy against her.

The circumstances just stated render it impossible that the collision could have occurred, if the testimony of various of the libelant's witnesses were true; namely, that at the time the Bay Queen started from her dock the D. R. Martin was abreast, or nearly abreast, of the Bay Queen. The full speed at which the Martin was running, her shorter distance from the end of Long Dock, and the less eddy to pass through, would, if that testimony had been true, have brought the Martin several lengths ahead of the Bay Queen at the time the latter reached Long Dock. I am obliged to hold all this testimony, therefore, as a gross misrepresentation of the facts. The same circumstances, above stated, agree with the clear preponderance of the other testimony, that when the Bay Queen left her dock, the Martin was several lengths to the westward. The weather was fine; both were in full view of each other; and each knew the course and intention of the other. Upon the above facts the fault of the Martin is clear.

1. The Martin was plainly the overtaking boat; and, as such, she was bound to keep out of the way of the vessel ahead. Her speed at that time being considerably greater than the Bay Queen's, there is no doubt that the Martin did not actually lap the stern of the Bay Queen until a very short time before the collision. During all the time before that, she was clearly in the position of an overtaking boat, and had abundant time and room to keep out of the way, either by slackening speed, or by stopping, or by going to the northward. It is no defense that the Bay Queen had not acquired her full speed.

Again, she had the Bay Queen, from the first, on her own starboard hand, and on that ground she was also bound to keep out of the way. Considerable testimony was given on her part to the effect that she could not stop. I must consider that the merest pretext, and as untrustworthy as her testimony that she was not an overtaking boat. There was not in fact any need of stopping. She had only to keep to the northward after passing the schooner, and she would have been out of the way of the Bay Queen, and given the latter all the room she required to pass the Long Dock. I am satisfied from the evidence that the collision took place within less than 100 feet of the north-west corner of Long Dock. The Bay Queen was not yet perfectly straightened down the river, and she was so near the Long Dock that her stern concealed the end of the dock from the view of persons standing on the Bay Queen's dock. I find, therefore, that the Martin violated the state statute, which for-

bade her, as the overtaking boat, to go within 20 yards of the Bay Queen, (1 Rev. St. p. *684, § 7;) and she violated a further rule of navigation which forbade her passing so as to crowd upon the proper course of the vessel passed. As above stated, there was abundant room to the northward, and nothing to prevent the Martin, upon passing the stern of the schooner, from keeping away to the northward, giving to the Bay Queen sufficient space along the end of the dock.

2. I think no part of this loss can be charged upon the Bay Queen. The disregard of the various rules of navigation above indicated, on the part of the Martin, was so manifest and persistent as hardly to be deemed less than deliberate and reckless. The boats had repeatedly exchanged signals; the Martin giving two blasts, meaning that she would keep away to port. She might have done so, and have avoided the collision, but did not. The Bay Queen had the right of way. She had no reason to anticipate that the Martin, after passing the schooner, would not keep to the northward under a starboard helm, as her two whistles had repeatedly promised. The Bay Queen continued to go at slow speed, and just before the collision she stopped her engines; while the Martin ported her wheel, which tended to bring her across the Bay Queen's bows. The Martin's officers state that the wheel was ported but a few seconds before the collision, and was designed to throw her stern off, and ease the blow. Other witnesses state that the wheel was ported earlier, and that her course was actually changed so as to throw herself across the Bay Queen's bows. No reliance can be placed on the asserted intentions of the Martin's pilot to ease the blow, or to avoid the collision. Had any *bona fide* intention existed to avoid collision, or to yield the Bay Queen her rights, it is incredible that he would not have gone to the northward, under a starboard wheel, and have slowed her engines before the boats lapped each other. There is no small ground for suspicion that the Martin was handled with the deliberate purpose of running down the Bay Queen, or else forcing her upon the end of the pier, which, her witnesses say, would have been the result had she undertaken to back. The subsequent conduct of the Martin in continuing on at full speed, notwithstanding the collision, is in keeping with her previous management. Her whole navigation was so extraordinary that it could not have been anticipated by the Bay Queen; and I find that the latter, therefore, did all that was reasonably incumbent upon her to avoid the collision; and that the loss rightly falls upon the Martin, and that the libel should be dismissed, with costs.